[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
May 24, 2007
THOMAS K. KAHN
CLERK

_____

No. 06-13320
Non-Argument Calendar

_____

BIA Nos. A95-537-464 & A95-537-465

GLORIA ROCIO NARANJO LOAIZA,
a.k.a. Gloria Rocio Narano Gomez,
JAIME ALBERTO LOAIZA QUINTERO,
MILY JOHANNA LOAIZA NARANJO,
JAIME ALEJANDRO LOAIZA NARANJO,

Petitioners,

versus

U.S. ATTORNEY GENERAL,

Respondent.

_____

Petition for Review of a Decision of the
Board of Immigration Appeals

_____

(May 24, 2007)

Before BIRCH, BLACK and MARCUS, Circuit Judges.

PER CURIAM:

Gloria Rocio Naranjo Loaiza ("Loaiza"), her husband, Jaime Alberto Loaiza Quintero ("Quintero"), and her two children, Mily Johanna and Jaime Alejandro Loaiza Naranjo, through counsel, seek review of the Board of Immigration Appeals ("BIA")'s decision dismissing their appeal. We DENY the petition for review.

## I. BACKGROUND

Loaiza, a native and citizen of Colombia, was admitted to the United States on or about 15 February 2001, as a nonimmigrant visitor with authorization to remain until 14 May 2001. The Department of Homeland Security issued Loaiza a Notice to Appear ("NTA"), charging that she was subject to removal under INA § 237(a)(1)(B), 8 U.S.C. § 1227(a)(1)(B), for remaining in the United States for a time longer than permitted. Her family received similar NTAs.

On 6 April 2002, Loaiza filed an application for asylum and withholding of removal, as well as relief under the United Nations Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment ("CAT"), 8 U.S.C. §§ 1158, 1231(b)(3), 8 C.F.R. § 208.16(c), on account of political opinion.[1] Loaiza feared being subjected to torture if she were to return to Colombia. In her application, she indicated that she was a member of an the Colombian Preserve

_____

[1] Loaiza's husband Quintero and her two children were derivative applicants on Loaiza's asylum application and withholding from removal. As such, we will refer primarily to Loaiza.

2

Political Party and the Ozanam District Community Action Board. Loaiza claimed that she filed her application more than one year after her arrival in the United States because the family hoped to return to Colombia after "the government peace agreement" was signed. AR at 180. In Colombia, Loaiza stated that she was involved in the "commercialization of beauty products and goods for home life for various companies such as Avon, Leonisa, and Yanval." Id. at 182. Loaiza's husband, Quintero, had a degree in Industrial Economy and was involved in the production and distribution of skin care products. Loaiza's community work had the cooperation and approval of the Colombian Preserve Political Party and entailed training a group of 20 housewives to sell products out of their home. Because of their work in the community, Loaiza claims that she and Quintero began to receive threatening phone calls from guerrillas from the Popular Liberation Army ("EPL").

Loaiza claims that her troubles began when she inadvertently learned that EPL guerrillas stored their weapons at a group member's home. When the son of the group member found out that Loaiza knew about the weapons, he called and told her that the people he worked with did not like witnesses to their activities and that they wanted Loaiza "to leave the city, tell no one of this and disappear by [her] own means or else they would do it their way." Id. at 184.

A few days later, Loaiza asserted that a man who identified himself as being

3

part of the EPL called and told her that she had 48 hours to leave the city. Loaiza recounts that she and her family hastily went to Medellin to stay with friends. After three months, when they thought the situation had calmed down, Loaiza stated that she and her family returned home. Upon their return home, Loaiza alleged that "there was not a single day that passed without the calls." Id. Loaiza recounted that her son became very frightened after he answered one of the calls and had to be hospitalized because he suffered an asthma attack. She stated that Colombian authorities were unable to help the family because there was not enough resources to provide protection. Loaiza asserted that Quintero left the country alone because the threats became more frequent. After Quintero left, Loaiza believed the threat had dissipated but the calls started again at the end of 2000, and the family decided to go the United States at the beginning of 2001 for a few months to allow the situation to improve. Loaiza claimed that she and her family were told that if they returned to Colombia, they would be killed.

At the asylum hearing before the Immigration Judge ("IJ"), Loaiza appeared with counsel and stated that she admitted the factual allegations contained in the NTA and conceded removability. The court designated Colombia as the country of removal. The IJ told Loaiza that she was probably not eligible for asylum because she filed her application more than one year after she arrived in the United States and did not appear to fall into any of the exceptions.

When the hearing continued, Loaiza made several corrections to dates specified in her supplement. The IJ interrupted the testimony numerous times and asked several questions. Before the hearing was completed, the IJ asked whether there was anything further from either side, to which they replied, "[n]o, Judge." Id. at 146.

In his written order, the IJ denied Loaiza's application for asylum, withholding of removal and CAT relief. In his oral decision, the IJ stated, "[t]his is as close to friv[o]lous as I want to get, without jumping through the ice. I don't believe a word she said. And I don't believe a word he said. And this case has got so many holes, I could drive three trucks through them." Id. at 57. According to the IJ, Loaiza's alleged persecutors were "the stupidest guerrillas on the planet . . . [who had] been too long in a zoo . . . [and had] the patience of saints" because the guerrillas continued to warn her time and time again but never took any overt steps, despite knowing Loaiza's whereabouts at all times. Id. at 58. The IJ's oral decision is replete with similarly-toned statements. See, e.g., id. at 63-64 ("Who knows what happened to the brother-in-law. Who cares? It's ancient history. You know, where is there a necessarily connection. That's what she says. I don't believe it. It's not supported. It doesn't make any sense. Why didn't the guerrillas tell her that the first time?"). The IJ determined that Loaiza's "killer evidence," which included documents she requested in the year 2002, was either fraudulently

5

or untruthfully prepared because the letters were dated from the year 2000. Id. at 58, 60. The IJ concluded that Loaiza's testimony was internally inconsistent because she first stated that the threatening calls came from unidentified callers but then later attempted to change her testimony by alleging that all of the calls came from guerrillas. The IJ found that there was no evidence that the brother-in-law's death in 1991 was connected to Loaiza's threats. Ultimately, the IJ stated:

> I just don't find them credible. I've gone through all of the reasons, including the documentation which just smells bad, to put it bluntly. Their stories don't jive. They don't make any sense. If they had a real fear, they would have done something about it. They took no action. Both of them are out of time. I find that neither one are entitled to asylum. The application for withholding, withholding under [CAT] are denied.

Id. at 66-67. The IJ ordered Loaiza and her family removed to Colombia.

Loaiza filed a notice of appeal in which she claimed that the IJ committed reversible error by finding that Loaiza was not persecuted. In the notice of appeal, Loaiza stated that she and her family began to receive death threats from the EPL and that they were persecuted because of her imputed political opinion. In a pro se brief filed in support of the notice of appeal, Loaiza argued the IJ erred by finding that she was not entitled to asylum. In addition, Loaiza stated that her counsel was ineffective. Loaiza sought to set aside the removal order "based upon [i]neffective counsel and fear of torture." Id. at 16-17. Loaiza also complained that the IJ belittled her and spent more time personally attacking her and downplaying her

6

fear of harm than trying to help her.

The BIA dismissed Loaiza's appeal. The BIA found that Loaiza was not eligible for asylum because she did not apply within one year of her arrival and had not shown changed conditions or extraordinary circumstances for her delay. The BIA also found that there was a clear basis to find Loaiza incredible "[i]n light of the discrepancies and contradictions evident in the record." Id. The BIA based its credibility determination on the following: (1) Loaiza had testified that Quintero was involved in the promotion of the cosmetics and accompanied her to group meetings, but Quintero had testified that he was only involved in sports programs for children; (2) Loaiza had indicated on her application that she only lived in Pereira and Santa Rosa after January 1999, but she had later testified to living in additional places; (3) Loaiza had not provided any evidence that the EPL had the capability of pursuing her country-wide; and (4) Loaiza had not clarified why her two support letters, which were requested in 2002, were both dated in 2000. The BIA concluded that Loaiza had not shown that the credibility determination was clearly erroneous, even though other discrepancies the IJ noted would not have supported an adverse credibility finding.

The BIA went further and stated that, regardless of whether the record could support an adverse credibility ruling, Loaiza "[had] not shown harm amounting to past persecution or a country-wide probability of future persecution" because:

7

(1) threatening telephone calls alone did not rise to the level of past persecution,

(2) the death of her brother-in-law in 1991 was not related to her situation, and

(3) Loaiza did not show that the EPL would still be interested in finding her today.

Id. In addition, the evidence did not establish that it was more likely than not that

Loaiza would be subjected to torture by or with the acquiescence of the

government of Colombia. In a footnote, the BIA admonished the IJ's tone in his

oral decision, finding it "inappropriate" and bordering on the "unprofessional," and

noting his "acerbic and cynical commentary." Id. at 4 n.3. The BIA found that the

IJ was impatient at the hearing, but that there was no evidence that the IJ's

behavior deprived Loaiza of "a fair hearing or otherwise constituted a due process

violation." Id.

## II. DISCUSSION

The Petitioners argue on appeal that the IJ's behavior at the asylum hearing

violated their due process rights. We review an asylum applicant's constitutional

challenges de novo. Lonyem v. U.S. Att'y Gen., 352 F.3d 1338, 1341 (11th Cir.

2003) (per curiam) (citation omitted). "[T]he Fifth Amendment entitles aliens to

due process of law in deportation proceedings." Reno v. Flores, 507 U.S. 292,

306, 113 S. Ct. 1439, 1449 (1993) (citation omitted). "Due process is satisfied

only by a full and fair hearing." Ibrahim v. INS, 821 F.2d 1547, 1550 (11th Cir.

1987) (citation omitted). To prevail on a due process challenge, however, an alien

8

must show substantial prejudice.  Id. (citation omitted).  An alien can demonstrate substantial prejudice by showing that the outcome would have been different had the due process violation not occurred.  Id.

Here, we find that Petitioners were not denied due process.  While it is true that the IJ interrupted Loaiza's testimony on several occasions, a review of the record indicates that the purpose of most of the interruptions was to gain more clarification with regard to Loaiza's and Quintero's testimony.  Moveover, the vast majority of the IJ's interruptions and questions were probative as to the issues raised by Petitioners.  Many other interruptions were due to miscommunications involving the interpreter.  Petitioner does not point to any instances in the record where she was substantially prevented from testifying as to her story.

While it is true that the IJ appeared impatient and annoyed by some of Loaiza's and Quintero's responses and made some unnecessary and unprofessional comments at the hearing and in his oral decision, Petitioners have not shown that the outcome would have been different in the absence of those comments and interruptions.  See Ibrahim, 821 F.2d at 1550; see also Liteky v. United States, 510 U.S. 540, 556, 114 S. Ct. 1147, 1157-58 (1994) (finding that judge's conduct, which consisted of questioning of witnesses, cutting off testimony relevant to defendant's state of mind, and alleged "anti-defendant tone," was an ordinary effort at courtroom administration because it "occurred in the course of judicial

9

proceedings, and neither (1) relied upon knowledge outside such proceedings nor (2) displayed deep-seated and unequivocal antagonism that would render fair judgment impossible" (quotations and emphasis omitted)).  In fact, the BIA found that the record supported the IJ's adverse credibility ruling.  Moreover, even in the absence of an adverse credibility ruling, Petitioners did not show that they were subjected to past persecution, a well-founded fear of future persecution, or that they were entitled to CAT relief, because the "persecution" they complained of consisted only of threatening telephone calls.  Petitioners do not challenge the merits of those rulings.  Further, the BIA admonished the IJ for his unprofessionalism and his cynical and acerbic tone.  Therefore, Petitioners have not demonstrated substantial prejudice.

## III.  CONCLUSION

Upon review of the record and consideration of the parties' briefs, we discern no reversible error.  Accordingly, we **DENY** the petition for review.